40801. BUILDING AUTHORITY OF FULTON COUNTY et al.
v. STATE OF GEORGIA.
40802. JOHNSON v. STATE OF GEORGIA et al.
(321 SE2d 97)

HILL, Chief Justice.

On April 26, 1983, the Fulton County Building Authority (hereinafter the "Authority") adopted a resolution authorizing issuance of Retardation Center bonds in the principal amount of $2.1 million to finance the acquisition and construction of mental retardation training centers. The Retardation Center resolution contemplates conveyance from the county to the Authority of the land upon which the Retardation Center project would be situated; issuance of the Retardation Center bonds by the Authority and construction of the facilities with the proceeds of such bonds; and lease of the facilities from the Authority to the county. The lease agreement between the Authority and the county provides for payment of rent by the county to the Authority in the same amounts and at the same times as certain amounts are required to be paid by the Authority as debt service on the Retardation Center bonds.

On May 11, 1983, the Authority adopted a resolution authorizing the issuance of Government Center bonds to finance the cost of feasibility and financial studies, legal and accounting services, urban and architectural design services, and other studies, services and reports incidental thereto, and of preparing plans for an office building facility all for the benefit of the county (such studies, services, reports and preparation of plans to be referred to hereafter, collectively, as the "Governmental Center Undertaking"). The office building facility that is the subject of the Governmental Center Undertaking is described in the Government Center resolution as a "facility to accommodate the space needs of various departments and divisions of Fulton County government," including office space and related facilities (hereafter, the "Government Center Project"). It is contemplated that the Government Center Project will require a building or buildings of approximately 435,000 square feet at a cost of approximately $50 million.

The Government Center resolution authorizes the execution and delivery of a contract under which the Authority agrees to commence and complete the Government Center Undertaking (not the facility) for the county. The county, in consideration therefor, agrees to make contract payments in the same amount and at the same times as the debt service payments are due on the Government Center bonds.

Both the Government Center bonds and the Retardation Center

bonds were the subject of validation proceedings brought pursuant to OCGA § 36-82-60 et seq. Charlene Upshaw Johnson intervened and raised several objections to validation. The trial court consolidated the proceedings, overruled some of the intervenor's objections, sustained some of those objections, and therefore declined to validate the bonds. The Authority appeals from those portions of the trial court's order sustaining the intervenor's objections; the intervenor cross-appeals as to each objection which was overruled. We address the issues in the order in which they were raised by the intervenor and decided by the trial court.

The case is complicated by the fact that the laws in issue were enacted in 1980 and 1982 under the Constitution of 1976, and the judgment of the trial court was entered in December 1983, after the 1983 Constitution became effective on July 1 of that year. The constitutionality of a law is to be determined by the constitution in effect on the date the law became effective and by the constitution now in effect.[1]

One constitutional provision, Art. IX, Sec. III, Par. I (a) of the Constitution of 1983, being substantially identical for purposes of this case to Art. IX, Sec. VI, Par. I of the Constitution of 1976, is so fundamental to the authority system of financing, see 3 EGL, Authority Financing, § 2 (1975), and so frequently cited herein as to warrant special consideration. In the 1983 Constitution, it reads as follows: "The state, or any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, for the provision of services, or for the joint or separate use of facilities or equipment; but such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." Art. IX, Sec. III, Par. I (a), Const. 1983. The foregoing provision will be referred to herein as "the intergovernmental contracts provision."

1. The first argument made by the intervenor was that the County Building Authority Act, Ga. L. 1980, p. 4488, as amended, Ga. L. 1982, p. 5031, being applicable to all counties having a population of 550,000 or more according to the 1970 or any future U. S. census (and thereby being applicable only to Fulton County at the present time) was a special law and not a general law and therefore violated our constitutional prohibition against special laws.

At the time the 1980 act was passed the Constitution of 1976 was

---

[1] Any holding to the contrary in *Jones v. McCaskill*, 112 Ga. 453, 456 (37 SE 724) (1900), is overruled.

in effect. That Constitution provided that: "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law." Art. I, Sec. II, Par. VII. Open population acts applicable only to Fulton County and similar to the one in issue here have been upheld as general laws having uniform operation throughout the state. See *Commrs. of Fulton County v. Davis*, 213 Ga. 792 (3) (102 SE2d 180) (1958). Section 2 of the act specifying the members of the Authority does not render it invalid under *Stewart v. Anderson*, 140 Ga. 31 (78 SE 457) (1913), or *City of Atlanta v. Gower*, 216 Ga. 368 (116 SE2d 738) (1960). The General Assembly was authorized to find that the large population of a county is reasonably related to its financial needs. Compare *Dougherty County v. Bush*, 227 Ga. 137 (179 SE2d 343) (1971). Thus the act was not unconstitutional under the 1976 Constitution.

A similar constitutional prohibition is found in our current Constitution, the Constitution of 1983, at Art. III, Sec: VI, Par. IV: "(a) Laws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law. . . . (b) No population bill, as the General Assembly shall define by general law, shall be passed. . . ." We have found the County Building Authority Act to be a general law. Regarding paragraph (b), OCGA § 28-1-15 (c) (3) provides that the term "population bill" does not include: "A bill classifying political subdivisions having more than a specified population." Thus the act is not unconstitutional under the existing Constitution.

2. The intervenor's second contention is that the act is "fatally tainted by reason of the voter's failure to ratify a proposed constitutional amendment in the November, 1982 general election." See Ga. L. 1982, p. 2613; Amendment No. 38 at the 1982 election, see Ga. L. 1983, pp. 2084-2085. The proposed amendment was a local constitutional amendment authorizing and ratifying the creation by the General Assembly of a Fulton County Building Authority, and giving it certain powers. Had it passed, it would have been germane to certain issues before the court relating to the powers of the Authority (see Division 4). Since it did not pass, those questions must be, and are herein, decided by reference to adopted law. The fact that it did not pass does not "taint" the act at issue.

3. The third issue raised by the intervenor is whether the Authority can issue bonds for these projects. Relying on *Beazley v. DeKalb County*, 210 Ga. 41 (77 SE2d 740) (1953), and *Tippins v. Cobb County Parking Auth.*, 213 Ga. 685 (100 SE2d 893) (1957), intervenor contends it cannot under either the Constitution of 1976, Art. IX, Sec. VII, Par. I, or that of 1983, Art. IX, Sec. VI, Par. I. Those cases

stand for the principle that, under the Constitution of 1945, counties can only issue bonds to finance projects included in the Revenue Certificate Act of 1937, OCGA § 36-82-60 et seq., and a county authority is likewise limited since it cannot have more power than its principal, the county. The pertinent provision in the 1976 Constitution was identical to that in the 1945 Constitution; both limited issuance of bonds to projects authorized by the Revenue Certificate Act of 1937. But notwithstanding that the Constitution of 1976 was in effect at the time that the 1980 act was passed, we deal here not with the validity of the 1980 act but with the projects presently in issue, and we find it unnecessary to decide the validity of these projects under the 1976 Constitution. Assuming for the purposes of this division that the 1980 act is otherwise constitutional, the fact that these projects were not authorized would not render the act itself unconstitutional; it would merely render the projects ultra vires were they to be commenced while the Constitution of 1976 was in effect.

The Constitution of 1983 was ratified by the voters on November 2, 1982, to take effect on July 1, 1983. The resolutions at issue were adopted by the Authority in April and May of 1983, at a time when the Authority was necessarily cognizant of the provisions of the Constitution of 1983. The validation petition was filed May 12, 1983. The order denying validation was entered on December 12, 1983, some 5-½ months after the effective date of the Constitution of 1983. We hold that in these circumstances, in furtherance of judicial economy and efficiency, the validity of the resolutions authorizing these projects will be determined by reference to the Constitution of 1983. It provides in Art. IX, Sec. VI, Par. I that: "Any county, municipality, or other political subdivision of this state may issue revenue bonds as provided by general law." Intervenor's argument that these projects are not authorized by the Constitution of 1983 is grounded in the premise that the County Building Authority Act is not a general law. But we have held in Division 1, supra, that the County Building Authority Act is a general law, and thus we need look no further than at its provisions to determine whether these projects are authorized. It is clear beyond peradventure that the Retardation and Government Center Projects are within the scope of the term "project" as defined in Section 3 (C) of the act. Ga. L. 1982, pp. 5031, 5032.

4. The fourth argument made by the intervenor is that Section 3 of the 1982 amendment to the act violates the intergovernmental contracts provision of the 1976 and 1983 Constitutions, quoted above. Section 3 of the amendment reads as follows: "To make and execute with public and private persons and corporations, both foreign and domestic, contracts, leases, rental agreements, and other instruments relating to projects and to execute all instruments necessary or convenient, including contracts for construction of projects and leases of

projects, or contracts with respect to the use of projects which it causes to be erected or acquired, *and* any and all political subdivisions, municipal corporations, departments, institutions, or agencies of the state or any other state, and any other governmental agency, and the government of any other nation or any agency thereof, and the United States government or any agency thereof, and any private person, firm, or corporation are authorized to enter into contracts, leases, or agreements with the Authority upon such terms and for such purposes as they deem advisable, and without limiting the generality of the above, authority is specifically granted to any such lessee to enter into contracts and lease agreements for the use of any structure, building, or facility, or a combination of any two or more structures, buildings, or facilities of the Authority for a term not exceeding 50 years, and any such lessee may obligate itself to pay an agreed sum for the use of such property so leased, and also to obligate itself as part of the lease contract to pay the cost of maintaining, repairing, and operating the project so leased from the Authority." Ga. L. 1982, pp. 5031, 5033. (Emphasis supplied.)

Intervenor argues that this provision runs afoul of *State v. Blasingame*, 212 Ga. 222 (91 SE2d 341) (1956). *Blasingame* holds that the intergovernmental contracts provision does not "authorize contracts with foreign corporations or authorities by the State or its subdivisions for the performance of services within this State that are essentially governmental." Id. at 225. We observe that we need only concern ourselves with the first portion of the 1982 amendment, that which gives certain powers to county building authorities. To the extent that the latter portion purports to authorize other states and nations (including the United States) or their agencies to contract with county building authorities, it is ineffectual and ultra vires because such authorization is beyond the power of the General Assembly. Thus the issue is what is meant by public foreign corporations, as used in this act. The term public corporation is often used to denote a governmental entity. See *Teachers' Retirement System v. City of Atlanta*, 249 Ga. 196, 198 (288 SE2d 200) (1982); *Housing Authority v. Ayers*, 211 Ga. 728 (1) (88 SE2d 368) (1955). In fact, for many years a public corporation was defined as "[O]ne having for its object the administration of a portion of the powers of government, delegated to it for that purpose — such are municipal corporations." Code of 1933, § 22-103; Code of 1863, § 1625. But that definition was repealed by the Georgia Business Corporation Code, Ga. L. 1968, p. 565. And we have used the term "public corporation" to denote a corporation whose stock is traded over-the-counter, as opposed to a closely held corporation. *Scherer v. Scherer*, 249 Ga. 635, 636 (292 SE2d 662) (1982). Furthermore, when referring to public corporations which are governmental in nature, the intergovernmental contracts provision, quoted

above, speaks of the power to contract with "any other public agency, public corporation, or public authority. . . ." The language used in the 1976 Constitution differs slightly but the difference is not significant for the purposes of this discussion. What is significant is that the context in which the intergovernmental contracts provision speaks of public corporations makes it clear that it has reference to governmental or quasi-governmental entities. This is not the case in the statute at issue. Thus we conclude that had the 1982 amendment been meant to include governmental entities, it would have said so more clearly. We decline to read "public . . . corporations, both foreign and domestic" to include governmental corporations of foreign states and nations, and instead construe it to mean "public" in the sense of a nondomestic corporation whose shares are traded over-the-counter. We therefore find it unnecessary to consider the continuing vitality of *Blasingame*.

5. The fifth contention raised by intervenor is that the act violates the separation of powers provision of the Constitution (Const. of 1976, Art. I, Sec. II, Par. IV; Const. of 1983, Art. I, Sec. II, Par. III) because it designates the Chairman of the Board of Commissioners of the county as one of the three members of the Authority. Intervenor relies on *Massachusetts Bonding &c. Co. v. Floyd County*, 178 Ga. 595, 604 (173 SE 720) (1934), as a case in which it was held that the separation of powers clause applies to counties. But as intervenor candidly recognizes, the trial court's ruling there was not excepted to and was given effect by this court expressly because it was the law of the case; no ruling was made by this court on the merits.

The cited provision of the Constitution provides: "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided." In *Ford v. Mayor & Council*, 134 Ga. 820, 821 (68 SE 733) (1910), this court held "that the provision of the constitution referred to relates to State legislative, judicial, and executive powers, and has no relation to municipal offices, created by the legislature, in the discharge of strictly municipal functions." We adhere to the holding that the constitutional provision applies only to the state. It follows that just as it does not apply to municipalities, nor does it apply to county governments. Nor could it, since a county commission is both the executive and legislative branch. *Smith v. Bd. of Commrs. of Roads & Revenues*, 244 Ga. 133, 135 (259 SE2d 74) (1979). Thus the act is not unconstitutional for this reason.

6. The intervenor's sixth argument is that Fulton County has no power to convey its land to the Authority. The Retardation Center Resolution contemplates that the county will convey to the Authority certain unimproved land, for which the Authority will pay with the

proceeds from the sale of the Retardation Center bonds. The trial court ruled for the intervenor, holding that "While the Retardation Center project's land may properly be designated 'unserviceable' by the County, Article IX, Section III, Paragraph Ib of the new Constitution does not authorize the county . . . to convey raw land . . . to the Authority." We find it unnecessary to decide, however, whether Art. IX, Sec. III, Par. I (b) of the Constitution of 1983, which authorizes the conveyance of "any existing facilities or equipment," includes within its scope unimproved real property because the county has statutory authority to dispose of this property. See *Town of Decatur v. DeKalb County*, 130 Ga. 483 (61 SE 23) (1908). Under OCGA § 36-9-2, "The county governing authority . . . may . . . direct the disposal of any real property which may lawfully be disposed of. . . ." Under OCGA § 50-16-144 property which is unserviceable constitutes property which may lawfully be disposed of. *Davis v. Logan*, 206 Ga. 524 (3) (57 SE2d 568) (1950). Property becomes unserviceable "when it cannot be beneficially or advantageously used under all the circumstances for county purposes." *Malcom v. Fulton County*, 209 Ga. 392 (2) (73 SE2d 173) (1952). Here the trial court agreed that the property is unserviceable. Intervenor's contention that this finding is erroneous as a matter of law because once the property is improved the Authority will lease it back is not well taken. The fact that the property will be "serviceable" when improved does not automatically render it serviceable in its raw state.

7. The next contention made by the intervenor is that the act violates the Constitution by referring to more than one subject matter or containing matter different from what is expressed in the title. Const. of 1976, Art. III, Sec. VII, Par. IV; Const. of 1983, Art. III, Sec. V, Par. III. Specifically, the intervenor argues that the act covers two distinct subject matters: (1) the creation, functions and powers of county building authorities; and (2) the specific grant of power to other governmental entities to deal with the Authority (see Division 4, supra). Because the entire act deals with the creation and operation of county building authorities, we find this argument to be without merit. *Thompson v. Municipal Electric Auth.*, 238 Ga. 19 (12) (231 SE2d 720) (1976).

8. Intervenor's eighth objection is that: "Professional services performed by architects, attorneys, consultants and others in connection with preliminary planning for a facility do not, separately or in the aggregate, constitute a 'project' for the purposes of the statute, and, therefore, the funding of such services alone may not be financed out of the proceeds of sale of the Government Center bonds." The thrust of this argument is that a project must be a structure, building, utility or other facility, and that the Resolution is ultra vires because it contemplates that the bonds will finance feasibility studies and

other preliminary work. We decline to adopt intervenor's excessively narrow reading of the statute. A reasonable interpretation of authorization to finance construction of a complex project such as a government center is that it includes authorization to finance feasibility studies and related preliminary work. *Miller v. State*, 83 Ga. App. 135 (62 SE2d 921) (1951), on which intervenor relies, does not support intervenor's argument. In *Miller*, the bonds were to be issued to pay for additions and improvements to a municipal water-works system which were not otherwise described. The holding of *Miller* is that a proposed project or improvement to be financed by revenue certificates must be described in reasonable detail. Thus, where the bonds are issued to finance physical structures, the structures must be described in some detail. *Miller* does not hold that revenue certificates may only be issued to finance physical structures. Here the bonds are being issued to finance feasibility studies and preliminary work, which are described in sufficient detail to comply with *Miller*.

Finally, the contract is not void for want of mutuality on the ground that it cannot be enforced because the project is "merely in the drafting stages." The bargained-for consideration is that the Authority will accomplish certain "feasibility and financial studies, legal and accounting services, urban and architectural design services, other studies, services and reports and plans for development of certain facilities." In return, the county agrees to pay the price set forth in the contract. We discern no want of mutuality.

9. Intervenor's ninth argument is that the statute violates Art. IX, Sec. VII, Par. I of the Constitution of 1976 (Art. IX, Sec. V, Par. I of the Constitution of 1983) by authorizing the incurring of county debt without a referendum and without regard to the debt limitations imposed by the Constitution. As the trial court ruled, however, the statute and agreements entered into pursuant to it are validated by the intergovernmental contracts provision of the Constitution. This argument was rejected in *Frazer v. City of Albany*, 245 Ga. 399 (2) (265 SE2d 581) (1980).

10. Intervenor's tenth contention, that the agreements authorized by the act are in violation of OCGA § 36-30-3, is likewise without merit. The necessary authority to enter into contracts for up to 50 years is contained in the intergovernmental contracts provision, quoted at the outset in this opinion. *Smith v. State*, 217 Ga. 94 (3) (a) (121 SE2d 113) (1961).

11. Intervenor's eleventh contention is that the payments to be made by the county to the Authority under the agreements are donations or gratuities which are prohibited by the Constitution. Const. of 1976, Art. III, Sec. VIII, Par. XII (Const. of 1983, Art. III, Sec. VI, Par. VI). Since the payments are to be made pursuant to binding agreements and in return for bargained-for consideration, this argu-

ment is without merit.

12. Intervenor's final contention is that the appropriation by the county of funds required for the payments under the agreements is unlawful because it requires the levy of taxes without a referendum and without regard to the debt limitations imposed by Art. IX, Sec. VII, Par. I of the Constitution of 1976 (Art. IX, Sec. V, Par. I of the Constitution of 1983). This argument was laid to rest in *Thompson v. Municipal Electric Auth.*, 238 Ga. 19 (5), supra, considering Art. VII, Sec. VII, Par. I of the Constitution of 1945.

In conclusion, the intervenor has shown no valid reason why judgment should not issue confirming and validating the bonds. Therefore the rulings of the trial court in favor of confirmation and validation are affirmed and those denying confirmation and validation are reversed, as is the judgment denying confirmation and validation.

*Judgment in Case No. 40801 reversed. Judgment in Case No. 40802 affirmed. All the Justices concur.*

DECIDED SEPTEMBER 6, 1984.

*Alston & Bird, Jonathan W. Lowe, Ben F. Johnson III, Michael R. Pinkerton, Ferguson & Clarke, John T. Ferguson,* for appellants (case no. 40801).

*King & Spalding, Daniel J. O'Connor, Jr., Ruth West Brown,* for appellant (case no. 40802).

*Lewis R. Slaton, District Attorney, Alston & Bird, Jonathan W. Lowe, Ben F. Johnson III, Michael R. Pinkerton, Ferguson & Clarke, John T. Ferguson,* for appellees.